| | |
|---|---|
| DISTRICT COURT, WELD COUNTY, COLORADO<br>915 10th Street, Greeley, CO 80632<br><br>**Plaintiff:**<br><br>WOLVERINE ENERGY HOLDINGS, LLC<br><br>v.<br><br>**Defendant:**<br><br>NOBLE ENERGY, INC. | DATE FILED: March 6, 2020 5:10 PM<br>FILING ID: D6EA66AAB11DB<br>CASE NUMBER: 2020CV30198<br><br><br><br>▲ COURT USE ONLY ▲ |
| **Attorney for Plaintiff**<br>Mark S. Barron, #46924<br>Erica E. Youngstrom *(pro hac vice pending)*<br>Baker & Hostetler LLP<br>1801 California Street, Suite 4400<br>Denver, Colorado 80202<br>Telephone: 303.764.4023<br>Facsimile: 303.861.7805<br>mbarron@bakerlaw.com<br><br>*Attorneys for Wolverine Energy Holdings, LLC* | Case Number:<br><br><br><br><br>Div: |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiff Wolverine Energy Holdings, LLC ("Wolverine") submits respectfully this complaint seeking both declaratory and injunctive relief and an accounting against Noble Energy, Inc. ("Noble"). Wolverine is the owner of minerals that, at Noble's request, have been pooled in spacing units under the terms of pooling orders that the Colorado Oil & Gas Conservation Commission ("COGCC") has issued. Although Wolverine's minerals are subject to an oil and gas lease between Wolverine and Noble, that lease places express limits on Noble's right to pool Wolverine's oil and gas. The units created under the COGCC's pooling orders exceed the pooling rights Noble possesses under the oil and gas lease. As a result, Wolverine is entitled to a share of production from wells within the pooled units proportionate to Wolverine's mineral ownership within the units in exchange for Wolverine paying a proportionate share of operational costs. Because Noble continues to operate the wells in a manner inconsistent with the character of Wolverine's ownership interest in the pooled production, this Court should: (i) declare the true nature and scope of Wolverine's interest in production from pooled wells; (ii) direct Noble to conform Noble's operations to properly account for Wolverine's interest; and (iii) grant Wolverine a full accounting of Wolverine's share of costs and revenues attributable to production from the pooled wells.

## PARTIES

1. Wolverine is a Colorado limited liability company with principal offices at 999 18th Street, Suite 1650S, Denver, Colorado 80202.

2. Noble is a Delaware corporation with principal offices at 1001 Noble Energy Way, Houston, Texas 77070. Noble is authorized to and does conduct business in the State of Colorado.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over Noble under Colo. Rev. Stat. § 13-1-124, because Noble transacts business in this state and owns, uses, and possesses real property in this state.[1]

4. Venue in this Court is proper under Rule 98 of the Colorado Rules of Civil Procedure because real property that is the subject of this action is in Weld County.

## FACTUAL ALLEGATIONS

*The Lease*

5. On January 16, 2019, Wolverine acquired mineral rights in the E½NE¼ of Section 24, Township 3 North, Range 65 West, 6th P.M., Weld County, Colorado (the "Minerals"), effective December 19, 2018, pursuant to that certain Mineral and Royalty Deed recorded at Rec. No. 4460505 in the land records of the Weld County Clerk and Recorder's Office.

6. The Minerals are subject to an oil and gas lease, dated February 18, 1970, between Dick Nolan and V. Macine Nolan, as Lessor, and D. Kirk Tracy, as Lessee (the "Lease"), recorded at Rec. No. 1544389 in the land records of the Weld County Clerk and Recorder's Office.[2]

7. Wolverine is the current lessor under the Lease. Noble is the current lessee under the Lease.

8. Paragraph 16 of the Lease authorizes Noble to unitize the Lease "with any other lease or leases or portions thereof," but provides that such "unitization shall cover the gas rights only and comprise an area not exceeding approximately 640 acres."

---

[1] The COGCC lacks subject matter jurisdiction over this matter because it involves the interpretation of contractual rights under an oil and gas lease. *See Chase v. Colo. Oil & Gas Conservation Comm'n*, 2012 COA 94, ¶¶ 33-37 (affirming COGCC's ruling that COGCC lacked jurisdiction to interpret the lease); *Grynberg v. Colo. Oil & Gas Conservation Comm'n*, 7 P.3d 1060, 1063 (Colo. App. 1999) (holding COGCC lacked jurisdiction to interpret royalty agreement to determine the propriety of post-production deductions).

[2] A true and accurate copy of the Lease is enclosed as Exhibit 1 to this Complaint.

4811-4740-1648.4                              - 2 -

*Noble's Operations*

9. On June 8, 2011, Noble applied to the COGCC for an order pooling interests into a 400-acre spacing unit for the purpose of drilling the Butterball H24-69HN Well (API No. 05-123-34328) for production of oil, gas, and associated hydrocarbons. Among other interests, Noble's application sought to include within the proposed spacing unit the N½NE¼ of Section 24, Township 3 North, Range 65 West, 6th P.M.

10. COGCC rules require that notice of applications for pooling orders be served on all persons owning any interest in the mineral estate, whether leased or unleased, of the tracts to be pooled, except owners of an overriding royalty interest. By testimony dated July 12, 2011, Noble advised the COGCC that all interested parties received notice of Noble's June 8, 2011 application.

11. Noble's application papers do not identify Wolverine's predecessor-in-interest in the Minerals as one of the recipients to whom notice of application was sent.

12. On August 12, 2011, the COGCC issued Order No. 407-453 granting Noble's application. Lands pooled under Order No. 407-453 include the N½NE¼ of Section 24, Township 3 North, Range 65 West, 6th P.M.

13. Because the Lease only grants Noble authority to unitize gas rights (and only in units of 640 acres or less): (i) Noble lacks the contractual authority to pool the Lease in the manner Noble's June 8, 2011 application contemplates; and (ii) production of oil from wells pooled under Order No. 407-453 is outside the scope of the Lease.

14. Because Wolverine has not granted Noble the right to pool Wolverine's oil rights, Wolverine may elect to participate in the Butterball H24-69HN Well (or any other wells drilled within the pooled area), execute a lease with Noble, or proceed as a non-consenting owner subject to the financial terms outlined in Colo. Rev. Stat. § 34-60-116.

15. The Butterball H24-69HN Well has been in producing status since at least January 2012. Upon information and belief, Noble has sold oil produced from the well.

16. On June 4, 2018, Noble applied to the COGCC for an order pooling interests into an approximately 677-acre spacing unit for the purpose of drilling the Emmy H25-711 Well (API No. 05-123-46968) for production of oil, gas, and associated hydrocarbons. Among other interests, Noble's application sought to include within the proposed spacing unit the E½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.

17. By sworn testimony dated June 21, 2018, Noble advised the COGCC that all interest parties received notice of Noble's June 4, 2018 application.

18. The notice that Noble served to alert Wolverine's predecessor-in-interest in the Minerals of Noble's June 4, 2018 application did not specify whether Noble sought to pool the Lease or the Minerals. Noble did not request that Wolverine's predecessor amend the Lease to allow for the pooling of oil rights and/or the pooling of gas rights into units larger than 640 acres.

19. Noble did not offer to enter a new lease with Wolverine's predecessor. Noble did not advise Wolverine's predecessor of the estimated costs associated with participation in development of the Emmy H25-711 Well or any other oil and gas wells within the pooled area.

20. On August 21, 2018, the COGCC issued Order No. 407-2575, granting Noble's application. Lands pooled for the Emmy H25-711 Well under Order No. 407-2565 include the E½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.

21. Because the Lease only grants Noble authority to unitize gas rights (and only in units of 640 acres or less): (i) Noble lacks the contractual authority to pool the Lease in the manner Noble's June 4, 2018 application contemplates; and (ii) production of oil and gas from wells pooled under Order No. 407-2575 is outside the scope of the Lease.

22. Because Wolverine has not granted Noble the right to pool Wolverine's oil rights under any spacing arrangement or Wolverine's gas rights into units greater than 640 acres, Wolverine may elect to participate in the Emmy H25-711 Well (or any other wells drilled within the pooled area), execute a lease with Noble, or proceed as a non-consenting owner subject to the financial terms outlined in Colo. Rev. Stat. § 34-60-116.

23. The Emmy H25-711 Well has been in producing status since at least April 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

24. On August 30, 2018, Noble submitted an application to the COGCC for ten pooled units for purposes of drilling for oil, gas, and associated hydrocarbons:

    (a) a 400-acre spacing unit for the purpose of drilling the Emmy State H25-718 Well (API No. 05-123-46967), including the E½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;

    (b) an 800-acre spacing unit for the purpose of drilling the Emmy State H25-724 and Emmy State H25-731 Wells (API Nos. 05-123-46969 & 05-123-46971), including the E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;

    (c) a 400-acre spacing unit for the purpose of drilling the Emmy State H25-738 (API No. 123-05-46972), including the W½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;

    (d) an 800-acre spacing unit for the purpose of drilling the Emmy State H25-744 and Emmy State H25-751 Wells (API Nos. 05-123-46970 & 05-123-46977), including the W½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;

    (e) a 760-acre spacing unit for the purpose of drilling the Emmy State H25-757 Well (API No. 05-123-46974), including the W½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.; and

    (f) an 800-acre spacing unit for the purpose of drilling the Independence State

>   D30-784 Well (API No. 05-123-47687), including the E½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.

25. By sworn testimony dated October 3, 2018, Noble advised the COGCC that all interest parties received notice of Noble's August 30, 2018 application.

26. The notice that Noble served to alert Wolverine's predecessor-in-interest in the Minerals of Noble's August 30, 2018 application did not specify whether Noble sought to pool the Lease or the Minerals. Noble did not request that Wolverine's predecessor amend the Lease to allow for the pooling of oil rights and/or the pooling of gas rights into units larger than 640 acres.

27. Noble did not offer to enter a new lease with Wolverine's predecessor. Noble did not advise Wolverine's predecessor of the estimated costs associated with participation in development of any of the wells identified in the August 30, 2018 application or any other oil and gas wells within the pooled area.

28. On November 20, 2018, the COGCC issued Order No. 407-2662, granting Noble's application. Under the terms of Order No. 407-2662:

>   (a) lands pooled for the Emmy State H25-718 Well include the E½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;
>
>   (b) lands pooled for the Emmy State H25-724 and Emmy State H25-731 Wells include the E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;
>
>   (c) lands pooled for the Emmy State H25-738 Well include the W½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;
>
>   (d) lands pooled for the Emmy State H25-744 and Emmy State H25-751 Wells include the W½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.;
>
>   (e) lands pooled for the Emmy State H25-757 Well include the W½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.; and
>
>   (f) lands pooled for the Independence State D30-784 Well include the E½E½ of Section 24, Township 3 North, Range 65 West, 6th P.M.

29. Because the Lease only grants Noble authority to unitize gas rights (and only in units of 640 acres or less): (i) Noble lacks the contractual authority to pool the Lease in the manner Noble's August 30, 2018 application contemplates; (ii) production of oil from wells pooled under Order No. 407-2662 is outside the scope of the Lease; and (iii) production of gas from wells pooled into units larger than 640 acres under Order No. 407-2662 is outside the scope of the Lease.

30. Because Wolverine has not granted Noble the right to pool Wolverine's oil rights under any spacing arrangement or Wolverine's gas rights into units greater than 640 acres, Wolverine may elect to participate in the following wells (or any other wells drilled within the pooled area): (i) the Emmy H25-718 Well; (ii) Emmy State H25-724 Well; (iii) the Emmy State H25-731 Well; (iv) the Emmy State H25-738 Well; (v) the Emmy State H25-744 Well; (vi) the

Emmy State H25-751 Well; (vii) the Emmy State H25-757 Well; and (viii) the Independence State D30-784 Well. In the alternative, Wolverine may execute a lease with Noble or proceed as a non-consenting owner subject to the financial terms outlined in Colo. Rev. Stat. § 34-60-116.

31.  The Emmy State H25-718 has been in producing status since at least April 2019. Upon information and belief, Noble has sold oil produced from the well.

32.  The Emmy State H25-724 has been in producing status since at least April 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

33.  The Emmy State H25-731 has been in producing status since at least March 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

34.  The Emmy State H25-738 has been in producing status since at least March 2019. Upon information and belief, Noble has sold oil produced from the well.

35.  The Emmy State H25-744 has been in producing status since at least March 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

36.  The Emmy State H25-751 has been in producing status since at least February 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

37.  The Emmy State H25-757 has been in producing status since at least February 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

38.  The Independence State D30-784 has been in producing status since at least April 2019. Upon information and belief, Noble has sold both oil and gas produced from the well.

39.  For production from the ten wells identified in paragraphs 9 through 38 above (the "Wells"), Noble's division orders and revenue statements appear to credit Wolverine as a royalty interest owner.

*The Proposed Amendment*

40.  By letter dated September 5, 2019, Brant Douglass, Senior Landman at Noble, requested that Wolverine agree to amend the Lease. Observing that the "Lease contains an inadequate pooling provision, in that it only allows for the pooling of gas," Noble proposed an amendment that would "allow[] for both oil and gas to be pooled into a spacing unit."

41.  Noble's September 5, 2019 letter proposed an amendment that would have authorized Noble to pool or unitize the Lease "when in [Noble's] judgment it is necessary or advisable to do so." Noble's letter did not offer Wolverine any consideration in exchange for agreeing to this amendment. Nor does Noble's September 5, 2019 letter contain any reference to Noble's previously-filed applications to pool the Minerals.

42.  Wolverine has never executed or otherwise agreed to Noble's proposed amendment to the Lease.

*Wolverine's Election*

43. On October 24, 2019, Wolverine's Director of Land, Chris Brennan contacted Douglass by e-mail. Brennan agreed with the contention in Noble's September 5, 2019 letter that the Lease "contains an inadequate pooling provision." Brennan observed that Noble had nevertheless been producing Wolverine's Minerals through the Wells. Brennan advised Noble that Wolverine was prepared to pay Wolverine's share of the Wells' costs and requested that Noble provide Wolverine with Authorizations for Expenditure ("AFEs") or Joint Interest Billings ("JIBs") indicating what those costs would be.

44. On the same day, October 24, 2019, Douglass responded to Brennan's e-mail. Douglass noted that the Butterball H24-69HN Well has been plugged and abandoned and that each of the other Wells had been "adequately pooled through statutory pooling proceedings." Douglass did not provide any response to Wolverine's request for an AFE or JIB identifying Wolverine's share of the Wells' costs.

45. On October 25, 2019, Brennan replied to Douglass, indicating that Wolverine was aware that pooling orders had been issued for the Wells. Brennan noted, however, that because the pooling orders Noble sought, and the COGCC approved, are broader than the scope of pooling the Lease authorizes, Wolverine is effectively a working interest owner in production from the pooled Wells, not a royalty interest owner. Brennan acknowledged that, as a working interest owner, Wolverine was responsible for Wolverine's proportional share of the Wells' operational cost and confirmed that Wolverine was ready to immediately pay all amounts due upon receipt of an AFE/JIB.

46. On October 28, 2019, Douglass replied that Noble would not be sending Wolverine AFEs "because Noble has a valid lease that has been statutorily pooled."

47. By letter dated November 26, 2019, Wolverine, through its counsel, demanded that – consistent with the terms of the Lease and the pooling orders the COGCC issued – Noble provide Wolverine a full accounting of Wolverine's interest in production from the Wells and any other wells drilled or planned within pooled units that include Wolverine's minerals. Wolverine also demanded that Noble provide Wolverine with AFEs for Wolverine's share of the cost of those wells.

48. On December 12, 2019, Noble responded to Wolverine's November 26, 2019 letter, purporting to provide accounting information responsive to Wolverine's demand. Noble transmitted to Wolverine: (i) division orders for each of the Wells; (ii) IRS Form W-9 for Wolverine Energy; (iii) a spreadsheet containing Noble's calculation of Wolverine's net revenue interest in each of the Wells; and (iv) a list of payments Noble has made to Wolverine attributable to production from the Wells.

49. Noble's spreadsheet calculating Wolverine's net revenue interest in each of the Wells allocates the following net revenue interests to Wolverine:

| Well | Net Revenue Interest (%) |
|---|---|
| Butterball H24-69HN | 0.644335 |
| Emmy H25-711 | 0.372072 |
| Emmy State H25-718 | 0.625000 |
| Emmy State H25-724 & Emmy State H25-731 | 0.625000 |
| Emmy State H25-738 | 0.625000 |
| Emmy State H25-744 & Emmy State H25-751 | 0.312500 |
| Emmy State H25-757 | 0.328947 |
| Independence State D30-784 | 0.336003 |

50. Because Noble characterizes Wolverine's interest in each Well as a royalty interest, Noble's calculations of Wolverine's net revenue interests are incorrect. Wolverine's actual net revenue interests are as follows:

| Well | Net Revenue Interest (%) |
|---|---|
| Butterball H24-69HN | 10.30936 |
| Emmy H25-711 | 5.95315 |
| Emmy State H25-718 | 10.00000 |
| Emmy State H25-724 | 10.00000 |
| Emmy State H25-731 | 10.00000 |
| Emmy State H25-738 | 10.00000 |
| Emmy State H25-744 | 5.00000 |
| Emmy State H25-751 | 5.00000 |
| Emmy State H25-757 | 5.26315 |
| Independence State D30-784 | 5.37605 |

51. Noble has never provided Wolverine with an AFE or JIB for Wolverine's share of the cost of the Wells.

52. Upon information and belief, Noble has attempted to make revenue payments attributable to production from the Wells based on Noble's calculation of Wolverine's net revenue interest as documented in Noble's December 12, 2019 spreadsheet.

53. Wolverine has not accepted any revenue payments Noble tendered attributable to production from the Wells. All such funds Wolverine has received from Noble have been deposited in a trust account under the control of Wolverine's outside counsel. Wolverine remains ready to immediately return any revenue funds received should the funds Noble has tendered to Wolverine exceed Wolverine's true net revenue interest in production from the Wells minus Wolverine's share of the Well's operational costs.

## COUNT I

### DECLARATION OF WOLVERINE'S NET REVENUE INTEREST

54. Wolverine reasserts and incorporates by reference the preceding paragraphs 1 to 53.

55. An oil and gas lessee has no power to pool without the lessor's express authorization which is usually contained in the pooling clause of the lease. For pooling to be valid, it must be done in accordance with the method and purposes specified in the lease.

56. The Lease authorizes Noble to unitize the Lease "with any other lease or leases or portions thereof," but provides that such "unitization shall cover the gas rights only and comprise an area not exceeding approximately 640 acres." The Lease does not authorize Noble to produce Wolverine's oil through pooled wells under any spacing arrangement or to produce Wolverine's gas through pooled wells in spacing units exceeding 640 acres. As a result, Wolverine's Minerals are effectively unleased for purposes of production from wells pooled under Order Nos. 407-453, 407-2575, and 407-2662. Each of these orders authorizes pooling of oil and the majority of the orders authorize the pooling of gas rights into units larger than 640 acres.

57. When pooling minerals for which an operator lacks pooling authority under an oil and gas lease, an operator must comply with the requirements applicable to statutory pooling. Among other requirements, the operator must tender unleased mineral owners a good faith, reasonable offer to lease or participate as a working interest owner in production from wells drilled within the pooled area.

58. Because the Lease does not grant Noble a contractual right to pool Wolverine's Minerals in the manner Noble sought and the COGGC approved, Wolverine may elect to participate in the Wells (or any other wells drilled within the pooled areas described herein), execute a lease with Noble, or proceed as a non-consenting owner subject to the financial terms outlined in Colo. Rev. Stat. § 34-60-116.

59. Wolverine has advised Noble that Wolverine has elected to participate in the Wells as a working interest owner. Wolverine has conveyed to Noble Wolverine's readiness and intent to pay any costs attributable to Wolverine's working interest immediately upon receiving an AFE or JIB from Noble identifying those costs.

60. Wolverine has not accepted any revenue payments Noble tendered attributable to production from the Wells. Wolverine remains ready to immediately return any funds received should the funds Noble has tendered to Wolverine exceed Wolverine's true net revenue interest in production from the Wells minus Wolverine's share of the Well's operational costs.

61. Based on Wolverine's acreage position within each approved spacing unit, Wolverine owns the following net revenue interest in production from the Wells:

| Well | Net Revenue Interest (%) |
|---|---|
| Butterball H24-69HN | 10.30936 |
| Emmy H25-711 | 5.95315 |
| Emmy State H25-718 | 10.00000 |
| Emmy State H25-724 | 10.00000 |
| Emmy State H25-731 | 10.00000 |
| Emmy State H25-738 | 10.00000 |
| Emmy State H25-744 | 5.00000 |
| Emmy State H25-751 | 5.00000 |
| Emmy State H25-757 | 5.26315 |
| Independence State D30-784 | 5.37605 |

## COUNT II

### DECLARATORY AND INJUNCTIVE RELIEF

62.     Wolverine reasserts and incorporates by reference the preceding paragraphs 1 to 61.

63.     For production from the Wells, Noble's division orders and revenue statements appear to credit Wolverine as a royalty interest owner. Because Noble characterizes Wolverine's interest in each Well as a royalty interest, Noble's calculations of Wolverine's net revenue interests are incorrect.

64.     Upon information and belief, Noble has attempted to make revenue payments attributable to production from the Wells based on Noble's calculation of Wolverine's net revenue interest as documented in Noble's December 12, 2019 spreadsheet. Because Noble has miscalculated Wolverine's net revenue interest, the revenue payments Noble has tendered to Wolverine represent an underpayment.

65.     Wolverine has not accepted any revenue payments Noble tendered attributable to production from the Wells. All such funds Wolverine has received from Noble have been deposited in a trust account under the control of Wolverine's outside counsel. Wolverine remains ready to immediately return any funds received should the funds Noble has tendered to Wolverine exceed Wolverine's true net revenue interest in production from the Wells minus Wolverine's share of the Wells' operational costs.

66.     Noble's division orders and revenue statements require modification to properly account for the nature of Wolverine's interest in production from the Wells and any additional wells that may be drilled and completed in the unitized areas.

67.     Noble's revenue payments for present and future production must be based on Wolverine's true net revenue interest in the Wells, as described herein or as otherwise proven at trial.

## COUNT III

## ACCOUNTING

68. Wolverine reasserts and incorporate by reference the preceding paragraphs 1 to 67.

69. Because the Lease does not grant Noble a contractual right to pool Wolverine's Minerals in the manner Noble sought and the COGGC approved, Wolverine may elect to participate in the Wells (or any other wells drilled within the pooled areas described herein), execute a lease with Noble, or proceed as a non-consenting owner subject to the financial terms outlined in Colo. Rev. Stat. § 34-60-116.

70. Wolverine has advised Noble that Wolverine has elected to participate in the Wells as a working interest owner.

71. Wolverine has repeatedly requested that Noble provide Wolverine with an AFE or JIB identifying Wolverine's share of the operational costs for the Wells. Noble has never provided Wolverine with an AFE or JIB for Wolverine's share of the Wells' cost. Wolverine has conveyed to Noble Wolverine's readiness and intent to pay any costs attributable to Wolverine's working interest immediately upon receiving an AFE or JIB from Noble identifying those costs.

72. Wolverine is entitled to a share of production proportionate to Wolverine's mineral ownership within the unitized areas in exchange for Wolverine paying a proportionate share of operational costs.

73. Noble has never provided Wolverine any statement or other reporting data documenting all costs incurred, together with the quantity of oil and gas produced, and the amount of proceeds realized from the sale of production of oil and gas, such that Wolverine would be able to quantify and understand both Wolverine's financial obligations to Noble and the value of Wolverine's interest in production from the Wells.

## PRAYER FOR RELIEF

Wolverine requests respectfully the Court grant the following relief:

1. Declare production of oil from the Wells and any additional wells that may be drilled in the future within the unitized areas to be outside the scope of the Lease;

2. Declare production of gas from any of the Wells located within unitized areas greater than 640 acres and any additional wells that may be drilled in unitized areas greater than 640 acres in the future to be outside the scope of the Lease;

3. Declare that, upon Wolverine's election to participate, Wolverine is entitled to a share of oil production from the Wells (and any additional wells that may be drilled in the future within the unitized areas) proportionate to Wolverine's mineral ownership within the unitized areas in exchange for Wolverine paying a proportionate share the costs;

4. Declare that, upon Wolverine's election to participate, Wolverine is entitled to a share of the gas production from any of the Wells located within unitized areas greater than 640

acres (and any additional wells that may be drilled in unitized areas greater than 640 acres in the future) proportionate to Wolverine's mineral ownership within the unitized areas in exchange for Wolverine paying a proportionate share of operational costs;

      5.      Declare that Wolverine has the following net revenue interests in the Wells:

| Well | Net Revenue Interest (%) |
|---|---|
| Butterball H24-69HN | 10.30936 |
| Emmy H25-711 | 5.95315 |
| Emmy State H25-718 | 10 |
| Emmy State H25-724 | 10 |
| Emmy State H25-731 | 10 |
| Emmy State H25-738 | 10 |
| Emmy State H25-744 | 5 |
| Emmy State H25-751 | 5 |
| Emmy State H25-757 | 5.26315 |
| Independence State D30-784 | 5.37605 |

      6.      Direct Noble to update any division orders, revenue sheets, and any other forms, records, or software necessary to properly characterize and accurately account for the nature and scope of Wolverine's interest in production from the unitized areas;

      7.      Direct Noble to supplement any past revenue payments to Wolverine that were underpaid because Noble inaccurately calculated Wolverine's net revenue interest in production;

      8.      Direct Noble to make any future revenue payments to Wolverine consistent with the net revenue interests identified in paragraph 5 of this Prayer for Relief;

      9.      Direct Noble to immediately provide Wolverine with any and all AFEs or JIBs identifying Wolverine's proportional share of the operational costs of the Wells;

      10.     Direct Noble to timely provide Wolverine with any and all AFEs or JIBs identifying Wolverine's proportional share of the operational costs of any wells that may be drilled within the unitized areas in the future;

      11.     Direct Noble to provide Wolverine with a full accounting documenting, at minimum: (i) all costs incurred in association with construction and operation of the Wells; (ii) the date any individual costs was incurred; (iii) the quantity of oil and gas each individual Well produced, reported monthly from date of first production; and (iv) the amount of proceeds realized from the sale of produced oil and gas for each individual Well, reported monthly from the date of first sale.

      12.     All authorized costs and attorneys' fees; and

      13.     Such other and further relief, in law and equity, to which Wolverine may be entitled.

## JURY DEMAND

Wolverine demands a trial by jury on all issues, claims, defenses, and counterclaims so triable.

Submitted respectfully this 6th day of March, 2020,

                                               */s/ Mark S. Barron*
                                               Mark S. Barron, #46924
                                               Erica E. Youngstrom (pro hac vice pending)
                                               Baker & Hostetler LLP
                                               1800 California Street, Suite 4400
                                               Denver, Colorado 80202
                                               303.861.0600
                                               mbarron@bakerlaw.com

                                               *Attorneys for Wolverine Energy Holdings, LLC*