**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Case No. 1:20-cv-00905-DDD-STV

WOLVERINE ENERGY HOLDINGS, LLC,

    Plaintiff,

v.

NOBLE ENERGY, INC.,

    Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

---

Plaintiff Wolverine Energy Holdings, LLC and its predecessors years ago leased the rights to develop certain oil and gas rights it owns in Weld County, Colorado, to Defendant Noble Energy, Inc. Among other things, the lease allows Noble to "unitize" or combine Wolverine's rights with others in the area to be extracted together, a process that Colorado law calls "pooling" and encourages for the efficient development of mineral resources.

In 2018, Noble sought, and, through the processes required by that law, the Colorado Oil and Gas Conservation Commission issued two pooling orders that included Wolverine's property as leased interests. The problem is that the lease only allowed pooling into units of less than 640 acres, but the Commission's orders pooled more than that. Wolverine then filed this suit seeking a declaration that its interests be deemed unleased. This matters because if Wolverine is deemed a non-leased owner it is entitled to a greater portion of the proceeds of production than it is under the lease.

Currently before the court is Noble's motion to dismiss, which argues for a variety of reasons that Wolverine's claims fail as a matter of law. While Wolverine has a point that Noble seems to have violated the restriction on pool size in the lease, it did not object to being included in the pooling orders during the process created by statute and regulation for doing so. Nor did it sue for breach of the lease. Instead, it has in essence asked this court to rewrite the state commission's orders after the fact, a remedy it is not entitled to. The court **GRANTS** Noble's motion.

## BACKGROUND

In reviewing Noble's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the court accepts as true the well-pleaded factual allegations in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

This case centers on an oil and gas lease (the "Lease") to the land and underlying hydrocarbons in E½NE¼ of Section 24, Township 3 North, Range 65 West, 6th P.M., Weld County, Colorado. Doc. 2 ("Compl.") at ¶ 1. The Lease was initially issued in 1970 by Dick Nolan as lessor to D. Kirk Tracy as lessee. *Id.* Noble later acquired Mr. Tracy's interest. *Id.* at ¶ 7. And Wolverine obtained Mr. Nolan's interest in 2019. *Id.*

Paragraph sixteen of the Lease authorizes Noble to "unitize" the hydrocarbons subject to the Lease "with any other lease or leases or portions thereof," provided that such "unitization shall cover the gas rights only and comprise an area not exceeding approximately 640 acres." *Id.* at ¶ 8. For the layman, "unitization" or "pooling"[1] is a legal process by

---

[1]  The parties use the terms "unitization" and "pooling" interchangeably, even though there is authority to suggest that they aren't perfect synonyms:

which two or more tracts of land are combined into one unit for purposes of development of oil and gas resources. Timothy C. Dowd, *et al.*, Rocky Mtn. Mineral L. Found. Ann. Inst., *Statutory Pooling and the Unleased Mineral Owner* § 13-8 (July 2019). Before pooling statutes were enacted, the common law entitled an owner of land who drilled an oil well to gain ownership to all oil and gas produced by the well, whether or not the oil and gas were located under the owner's land or migrated to the well from his neighbor's land. Robert E. Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas*, 13 *Tex. L. Rev.* 391, 393 (1935) ("The owner of a tract of land acquires title to the oil or gas which he produces from wells drilled thereon, though it may be proved that part of such oil or gas migrated from adjoining lands."). Pooling statutes were enacted to counteract the tragedy-of-the-commons problem caused by the rule of capture. The classic example of the problem was the oil well drilled near Beaumont, Texas at the turn of the twentieth century:

> On January 10, 1901, near Beaumont, Texas, Captain Anthony F. Lucas and his drilling team struck oil after drilling more than 1,000 feet into the Spindletop salt dome. The

---

We note that unitization is similar to pooling, in that it also involves the combination of individual tracts of land into a larger unit for purposes of oil and gas development. However, the terms are not identical, and the unitization process is separate and distinct from the more typical spacing unit and pooling processes. The term unitization is properly used to describe "the joint operation of all or some portion of a producing reservoir." The statutory unitization process is typically semi-voluntary, meaning that interest owners are required to vote to approve a plan of unitization, but the plan becomes effective as to all interests once a certain percentage of owners, as set by statute, approve the plan.

*Dowd et al.*, *Statutory Pooling* § 13-9. (July 2019). For purposes of this case, though, it appears the difference does not change the analysis.

"black plume" that shot into the sky rose to twice the derrick height. This initial Spindletop well produced 800,000 barrels of oil in its first nine days, a world record. A hysteria of speculation followed, "with wells being drilled as close together as physically possible." By the end of 1901, 440 wells had been drilled on the 125-acre hill where Spindletop was located. The disastrous effects of this "oil rush" were manifest in the rapidly diminishing production returns. In 1904, only 100 of the 1,000 wells that had been drilled around Spindletop were producing at least 10,000 barrels per day. When Captain Lucas returned to Spindletop in 1904, he noted, "The cow was milked too hard, and moreover she was not milked intelligently."

Rance L. Craft, *Of Reservoir Hogs and Pelt Fiction: Defending the Ferae Naturae Analogy Between Petroleum and Wildlife*, 44 Emory L.J. 697, 701 (1995). This explosion in gas development caused pressure in the gas reservoir to dissipate, "leaving substantial amounts of oil in the ground that might have been recovered under a more rational plan of development." Dowd, *Statutory Pooling* § 13-3. Pooling statutes, along with well-spacing and other reforms, were states' response to the problems caused by the rule of capture.

Pooling is permitted in Colorado under Colorado Revised Statutes Section 34-60-116 and that provision's implementing regulations 2 Colo. Code Regs. § 404-1:530. Upon application to the Colorado Oil and Gas Conservation Commission, "when two or more separately owned tracts are embraced within a drilling unit, or when there are separately owned interests in all or a part of the drilling unit, then persons owning the interests may pool their interests for the development and operation of the drilling unit." Colo. Rev. Stat. § 34-60-116(6)(a). "In the absence of voluntary pooling," however, "the [Commission], upon the application of a person who owns, or has secured the consent of the owners of, more than forty-five percent of the mineral interests to be pooled, may enter

4

an order pooling all interests in the drilling unit for the development and operation of the drilling unit." *Id.* § 34-60-116(6)(b)(I); 2 Colo. Code Regs. § 404-1:530(a) (same). An application must demonstrate that the non-consenting owners "were tendered a good faith, reasonable offer to lease or participate no less than ninety (90) days prior to an involuntary pooling hearing." 2 Colo. Code Regs. § 404-1:530(b). Sixty days after receiving an offer to lease, an owner is deemed non-consenting if he does not respond to the offer. *Id.* § 404-:530(c)(2).

Section 34-60-116 makes material distinctions between consenting and nonconsenting owners of interests subject to a pooling order. Consenting owners of a drilling unit" are entitled to recover "one hundred percent of the nonconsenting owner's share of the cost of surface equipment" and "one hundred percent of the nonconsenting owner's share of the cost of operation of the well or wells," starting "with first production and continuing until the consenting owners have recovered such costs" *Id.* § 34-60-116(7)(b)(I). Consenting owners may also recover "two hundred percent" of the proportionate "costs and expenses of staking, well site preparation, obtaining rights-of-way, rigging up, drilling, reworking, deepening or plugging back, testing, and completing the well, . . . [and] equipment in the well, including the wellhead connections." *Id.* § 34-60-116(7)(d)(I). Leased owners are considered consenting owners under Section 34-60-116 and are entitled to the royalty rate in their lease. *See id.* As for "unleased nonconsenting mineral owners," the pooling statute prohibits the Colorado Oil and Gas Conservation Commission from entering "an order pooling" such "unleased nonconsenting mineral owner . . . over protest of the owner unless the commission" receives evidence that the unleased nonconsenting owner received, 60 days before the hearing on the pooling application, "a reasonable offer,

made in good faith, to lease upon terms no less favorable than those currently prevailing in the area." *Id.* § 34-60-116(7)(b)(II).

The crux of this case is whether Wolverine should be deemed a consenting, non-leased working-interest owner, as Wolverine contends it is. In oil-and-gas speak, a working-interest owner is the party who possesses the right to exploit minerals on the land. Working Interest, Black's Law Dictionary (11th ed. 2019). A working interest is different than a royalty interest in that a royalty-interest owner leases its right to exploit the minerals in exchange for a royalty on production proceeds.

In 2011 and 2018, Noble applied for, and received, three separate pooling orders from the Commission for three pools in Weld County that incorporated the minerals subject to the Lease. Compl. at ¶¶ 9–39. The two pooling orders issued in 2018 pooled interests of larger than 640 acres, the unitization limit permitted by the Lease. *Id.* at ¶¶ 16, 24. Wolverine's predecessor-in-interest received notice of the 2018 pooling orders. Compl. at ¶¶ 17, 26. And the pooling orders specify that they include Wolverine's interest and, importantly, that that interest was subject to a lease. *See, e.g.*, Doc. 10-4 at 3, 6, 14.[2]

Wolverine alleges that Noble "lack[ed] the contractual authority to pool the Lease" in this way. *Id.* at ¶¶ 21, 29. Wolverine seeks a declaratory judgment that it is entitled to the larger royalty interest of a working-interest owner under the pooling statute, than it would be entitled

---

[2] Even though this document, and several others, are evidence extrinsic to the complaint, the court will nevertheless consider it because it is a "document[] referred to in the complaint" that is "central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Waller v. City & Cty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)).

to under the Lease. Noble now moves to dismiss the complaint. Doc. 10.

## ANALYSIS

When presented with a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation marks omitted). "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). So a court can "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

All of Wolverine's claims depend on its assertion that the 2018 pooling orders exceeded the 640-acre maximum permitted by the Lease, and so "Wolverine's minerals [were] effectively unleased." Doc. 14 at 7. The first premise is true: the pooling orders go beyond the approximate-acreage limit in the Lease. And Wolverine cites persuasive authority that supports the common-sense notion that such limits are of financial value and a lessee that wants to pool beyond them ought generally to have to pay to do so. *See, e.g.*, *Browning Oil Co. v. Luecke*, 38 S.W.3d 625, 642 (Tex. App. 2000) ("In contravention of this intent, Lessees drilled wells they knew would not fit within the eighty acre spacing requirement and exceeded the authority granted in the pooling provisions.").

But there is at least one missing step in reaching the conclusion of

Wolverine's conclusion: just because pooling orders went beyond the Lease's limits does not mean that a federal court can essentially rewrite the Commission's orders and require that Wolverine be treated differently under state law and regulation than the state agency has ordered.

Wolverine admits it received notice of the proposed pooling orders, and at that time did not object to Noble or the Commission. Compl. at ¶¶ 17, 26. And the pooling orders, required by statute to "determine the interest of each owner in the unit and provide that each consenting owner is entitled to receive, subject to royalty or similar obligations," Colo. Rev. Stat. § 34-60-116 (7)(a)(II), in fact did so. The orders specify that they include Wolverine's interest and that that interest was subject to a lease. *See, e.g.*, Doc. 10-4 at 3, 6, 14.

Wolverine now asks this court to declare that that characterization was incorrect. More to the point, it asks this court to declare that despite the Commission's orders, Wolverine must be treated as an unleased interest under state law. That the court cannot do. If Wolverine wished to challenge its inclusion as a leased interest under state law it should have objected during the process authorized by state law. To the extent Wolverine is challenging the way its interest is classified under the 2018 pooling orders, that is an action for violation of Article 60 of Title 34 of the Colorado Revised Statutes and is thus barred by the one-year statute of limitations in Colo. Rev. Stat. § 34-60-115. If Wolverine wished to sue Noble for breach of contract, that might be an alternative, but it has not done so either.

For these reasons, Wolverine is thus barred from bringing this action.

## CONCLUSION

The court **GRANTS** Noble's motion to dismiss. Doc. 10. The clerk is directed to enter judgment in favor of Noble and terminate the case.

Dated: October 27, 2020.                    BY THE COURT:


_____
Daniel D. Domenico
United States District Judge